Timothy J. McIlwain, Esq.
NJ Attorney ID#010471996
McIlwain Law Firm
2020 New Road
Linwood, NJ 08221
Tel:  (877) 375-9599
Fax:  (609) 450-7017
Email:  AttorneyMcIlwain@Me.com

Attorneys for Plaintiff, William Deeney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| WILLIAM DEENEY, | CASE NO.: |
| Plaintiff, | |
| | |
| Vs. | CIVIL ACTION |
| | |
| BOROUGH OF AVALON.,; AS WELL AS BUSINESS ADMINSTRATOR SCOTT WAHL, in his individual capacity, WILLIAM McCORMICK, in his individual capacity and JOHN DOES 1 TO 10, inclusive | **COMPLAINT AND JURY DEMAND** |
| | |
| *Defendants.* | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PRELIMINARY STATEMENT

Plaintiff, WILLIAM DEENEY, by and through his attorney Timothy J. McIlwain, Esq., brings this civil rights action under 42 U.S.C. 1983, 42 U.S.C. 12112 *et. seq.,* 29 U.S.C. 2601 *et. seq.*, against Defendant Borough of Avalon ("AVALON") to redress injuries and damages resulting from statutory and constitutional violations of Plaintiff's rights under the 14th Amendment of the United States Constitution, as hereafter alleged:

### PARTIES, JURISDICTION, AND VENUE

1.     At all times relevant hereto, WILLIAM DEENEY (Plaintiff) is an individual and is now, and at all times mentioned in this Complaint, a resident of Cape May County, New Jersey.

2.     Plaintiff has worked as a mechanic for twenty-two (22) years; at all times mentioned in this Complaint, Plaintiff has enjoyed a good reputation, both generally and in his occupation.

3.     At all times relevant hereto, Defendant, BOROUGH OF AVALON (hereinafter "AVALON"), is a government entity located at 3100 Dune Drive, Avalon, NJ 08202, and was the employer of Plaintiff, Deeney, for all times relevant hereto this Complaint.

4.     Defendant, Scott Wahl, in his individual capacities for his conduct in

connection with his duties for Avalon.

5. Defendant, William McCormick, in his individual capacities for his conduct in connection with his duties for Avalon.

6. The true names of defendants DOES 1 through 10, inclusive, are unknown to Plaintiff at this time. Plaintiff is informed and believes, and based on that information and belief alleges, that each of the defendants designated as a DOE is legally responsible for the events and happenings referred to in this Complaint, and unlawfully caused the injuries and damages to Plaintiff alleged in this Complaint.

7. Plaintiff is informed and believes, and based on that information and belief alleges, that at all times mentioned in this Complaint, defendants were the agents and employees of their codefendants and in doing the things alleged in this Complaint were acting within the course and scope of such agency and employment.

8. Subject matter jurisdiction rests in this Court pursuant to 28 U.S.C. §§1343(a)(1), (2), (3), (4), and 28 U.S.C. §1331, because the transaction and events comprising this action arise under federal statute.

9. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1), (2) because all Defendants reside in Cape May County; all or a substantial part of the transactions and events comprising this action took place in Cape May County; and Defendants are subject to personal

jurisdiction in Cape May County.

## COMMON ALLEGATIONS

10. On or about April 2011, Plaintiff began his employment as a class 4 mechanic with Defendant AVALON.

11. Upon starting his employment, Plaintiff was a highly qualified mechanic with over ten (10) years of experience as a mechanic.

12. Upon starting his employment, Plaintiff expressed a desire to work diligently, mentor other employees, and work to be promoted within Defendant AVALON.

13. On or about May 2012, Director of Public Works, William Macomber ("Macomber"), promoted Shop Foreman, Stephen Camp ("Camp"), to another position in Public Works and promoted Robert Rhoda ("Rhoda") to Lead Supervising Mechanic.

14. Thereafter, Rhoda expressed a desire not to be given additional responsibilities.

15. As a result of Rhoda's expressed desire to not be given additional responsibility and Plaintiff's work performance, Camp and Macomber held a meeting with the shop staff, including but not limited to Rhoda, Nathan Morey ("Morey"), Leo Frame ("Frame"), and Plaintiff where Camp and Macomber informed the shop staff Plaintiff would begin to run the shop.

16.  Upon this information, Morey protested Plaintiff's promotion. Consequently, Plaintiff was assigned shared responsibility of the shop with Rhoda, instead of sole responsibility of the shop.

17.  On or about Plaintiff's third year of employment (2013), Plaintiff became Shop Foreman and began to run the shop. Plaintiff continued to express a desire to learn, better himself in his field of employment, and mentor other employees.

18.  On or about November 2016, Plaintiff was run over by a vehicle while hunting, which necessitated an airlift to the hospital and required a lengthy recovery.

19.  On or about January 2017, Plaintiff returned from work early from his injuries described in paragraph 18.

20.  Shortly thereafter, on or about 2017, Plaintiff became Defendant AVALON'S first class 5 mechanic and was sent to Rutgers University's Certified Public Works Manager ("CPWM") Program.

21.  On or about 2018, Plaintiff completed Rutgers University's CPWM program.

22.  Although other similarly situated employees had received promotions before completing similar programs, Plaintiff was not promoted until he completed Rutgers University's CPWM program.

23.  On or about August 2018, Plaintiff faced further protests from Morey to his supervisors, which prompted Morey's redesignation to another department.

24. Thereafter, Plaintiff, along with Camp, began to mentor a new employee, William McCormick, Jr. ("McCormick, Jr."), who was struggling to pass his required Class B CDL, a condition of McCormick, Jr.'s employment.

25. Unbeknownst to Plaintiff, McCormick, Jr., and Morey were friends.

26. McCormick, Jr., Morey, and other Borough employees began a concerted effort to remove Plaintiff from employment with Defendant AVALON.

27. On or about September 2019, McCormick, Jr. manufactured a complaint against Plaintiff, claiming Plaintiff made explicit comments against McCormick, Jr.'s mother and sister.

28. Prior to this, Plaintiff had no disciplinary actions against him throughout his employment with Defendant AVALON.

29. On or about October 2019, Morey manufactured a complaint to the Avalon Police Department ("Avalon Police") claiming Plaintiff was acting erratic and Plaintiff's behavior placed Morey in fear of injury.

30. At the time of the events described in paragraph 29, Plaintiff was out of state on a hunting trip.

31. Due to McCormick, Jr.'s manufactured statement to AVALON, Plaintiff was denied paid time off, and because of Morey's manufactured statement to Avalon Police, Plaintiff was forced to return to the state early from his hunting trip.

32. On or about November 4, 2019, and because of Morey's manufactured

statements to the Avalon Police, Macomber made statements assuring Avalon Police that Plaintiff was of sound mind and not a danger to himself or others.

33. Despite the events described in paragraph 31, Avalon Police unlawfully seized Plaintiff's lawfully owned firearms under New Jersey's "Red Flag Law."

34. On or about November 9, 2019, and because of the manufactured Complaint made by McCormick, Jr. against Plaintiff, there was a hearing to discipline Plaintiff.

35. Defendant AVALON told witnesses designated to testify on Plaintiff's behalf, including but not limited to Camp, that their jobs would be in jeopardy if they testified truthfully at Plaintiff's hearing.

36. During the November 2019 hearing, Camp testified that Defendant Avalon's agents threatened retaliation against Camp if he did not make false statements against Plaintiff's interest (i.e. witness tampered).

37. Despite the Defendant Avalon's threats of reprisal against Camp if he did not falsify testimony to provide a basis to discipline Plaintiff, Camp testified truthfully and explicitly stated that he was doing so at the risk of retaliation.

38. Plaintiff was disciplined, which included but not limited to losing his supervisory position despite testimony that Avalon witness tampered and no direct evidence against Plaintiff.   Upon information and belief,

the only evidence presented was inadmissible hearsay regarding

Plaintiff's alleged anti-semitic remarks.

39. The hearing officer determined that Avalon was an inappropriate

workplace where employment laws seemed to be ignored or

improperly enforced.

40. On or about January 2020, and because of Morey's manufactured

statements against Plaintiff, Plaintiff's "Red Flag Law" case was heard.

41. At the hearing described in paragraph 40, Plaintiff, using Borough

Records, which he had lawful access to through his employment with

AVALON, produced evidence to prove he was not in the state when

Morey's manufactured statements were made.

42. On or about June 2020, and because of the "Red Flag Law" hearing,

Plaintiff was deemed of sound mind. However, Morey and McCormick,

Jr. filed another manufactured complaint with AVALON claiming

Plaintiff stole the Borough Records that he used in the "Red Flag

Hearing."

43. Because of this second workplace complaint, Plaintiff was again

denied paid time off for a second hunting trip.

44. After Plaintiff was demoted from a supervisory role to a more

strainous labor role during 2020.

45. Early in September 2020, Plaintiff requested leave to grieve the death

of his grandmother, who raised Plaintiff when he was a child.

46. Plaintiff was unable to request leave at the time of his grandmother's

death because of some Covid restrictions.

47. Defendant Wahl denied Plaintiff's request to grieve his grandmother and was hear saying "she [Plaintiff's grandmother] died a few months ago, why does he need to take of now?"

48. Defendant Wahl ignored Avalon's policy that permits leave to be taken to grieve even if the time requested is not the on the exact date of death.

49. On or about the end of September 2020, despite his disability (back injury) from previous injuries, Defendant AVALON knowingly assigned Plaintiff to manual labor jobs that he was not healthy enough to perform upon returning to work.

50. Plaintiff injuried, aggravated, accelerated and/or worsened his pre-existing back injury do to his new duties that require labor such as working on cars upside down and lifting heavy things.

51. On September 25, 2020, Plaintiff requested an accommodation due to his physical limitations.

52. In response to Plaintiff's request for an accommodation, Defendants Avalon summarily denied the request.

53. Defendants did not engage in the interactive process after they were notified of Plaintiff's request for an accommodation.

54. Instead of engaging in the interactive process, Defendant instructed Plaintiff to provide documents and things before Defendant would consider Plaintiff's request for an accommodation.

55.   Defendant requested irrelevant and harassing documents such as the police report, location and details of the accident that caused his physical limitations.

56.   On October 8, 2020, Plaintiff again notified Defendants about his request for an accommodation wherein Defendants were given an opportunity to cure their discriminatory practice by not engaging in the interactive process.

57.   Defendants actions have shown a pattern of discrimination against Plaintiff when injured dating back to his 2016 car accident wherein Defendants required Plaintiff to use vacation time after the accident in violation of FMLA, 29 U.S.C. 2612(a)(1) knowing full well Plaintiff was not able to provide a medical certification form given the impractibility of his hospital stay and extent of injuries.

58.   After proving Plaintiff's back injury prevented him from doing this job, Defendant AVALON granted Plaintiff time off for the month of November 2020 to hunt and recover from his injuries.

59.   Upon granting this time off, Defendant AVALON consistently contacted Plaintiff, interrupting his time off and requesting Plaintiff return weeks early for another disciplinary hearing.

60.   On or about December 2020, Plaintiff returned to work but injured his back again when he fell into a bolt bin in the workplace.

61.   After the December 4, 2020 work related accident, Plaintiff hired Petro Cohen to pursue his workers compensation claims.

62. As a result of the workplace accident, Defendant AVALON, despite typically using a local doctor (Dr. Glass), referred Plaintiff to a North Jersey spinal doctor to treat his injuries.

63. The assigned doctor informed Plaintiff that further testing must be conducted before he could return to work.

64. Thereafter, against the spinal doctor's request, Defendant AVALON requested Plaintiff's return to work before medical clearance was granted.

65. Due to his continued injury and his citing pain and discomfort, Plaintiff informed Director William McCormick, Sr. ("McCormick, Sr. ") of his continued injury, to which McCormick, Sr. informed Plaintiff he would have to prove injury on his own time.

66. As a result of the events described in paragraph 65, Plaintiff requested time off to prove his injury.

67. Plaintiff, under the belief that his time off request was granted, sought treatment through his own doctor but noticed discrepancies in his paycheck soon after.

68. Due to the discrepancies described in paragraph 67, Plaintiff contacted McCormick, Sr. via text to inform McCormick, Sr. of the differences.

69. Plaintiff's text was met with no response.

70. On or about three (3) days after Plaintiff's text to McCormick, Sr., Plaintiff received an email informing him of his termination due to

five (5) consecutive days of absence from work without properly "calling out."

71.  On or about January 2021, Plaintiff received information from his doctor informing him of nerve damage in his leg and new injury to his back from the December fall.

72.  While out of work due to the work related injury and pursuing Plaintiff's workers compensation claim with Petro Cohen Law Firm, Plaintiff was terminated on or around January 15, 2021.

73.  After Plaintiff was terminated, he filed for unemployment benefits.

74.  Defendants opposed Plaintiff's unemployment benefits.

75.  Defendants manufactured false statements that were used to oppose Plaintiff's unemployment benefits.

76.  Defendants' in house general counsel, Charles E. Schlager, Jr., Esq., circulated scripts for employees to read during the telephonic hearing with the unemployment office.

77.  Defendant Avalon's employees were required to adopt the version of the facts drafted by in house attoney Schlager.

78.  Despite Defendants incredible positions that denied knowledge of Plaintiff's injury and falsified testimony, Plaintiff's unemployment and disability claims were denied.

## COUNT ONE

**(New Jersey Law Against Discrimination,
N.J.S.A. 34:15-39.1– Retaliation for Filing a Workers Compensation Claim)**

79. Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

80. N.J.S.A 34:15-39.1 prohibits an employer from retaliating against a person because he participated in a protected activity under the New Jersey Workers' Compensation Act.

81. When Plaintiff hired the Petro Cohen law firm to file her worker's compensation claim in December 2020 this constituted a protected activity.

82. On or around January 18, 2021, Defendant terminated Plaintiff for his work related injury and pursuit of a workers compensation claim, but claimed that Plaintiff abandoned his job.

83. Defendants' assertion that Plaintiff abandoned his job was pretext for the wrongful termination.

84. Defendants' retaliatory actions of bringing a bogus discrimination hearing against Plaintiff in November 9, 2019, (2) not participating in the interactive process after Plaintiff requested an accommodation and terminating Plaintiff when he was out on workers' compensation were adverse employment actions in violation of the aforementioned Act.

85. Thereafter, as a result of the protected activity, Defendants unlawfully retaliated against Plaintiff in violation of aforementioned Act.

86. In taking actions that they knew were a breach of Defendant Avalon, Defendant McCormick and Defendant Wahl's duty under the New Jersey Workers' Compensation Act, and knowingly giving substantial assistance or encouragement to the unlawful conduct of their employer, Defendant Wahl and McCormick are individually liable under NJLAD.

87. Defendants' conduct was egregious, willful and wanton and in reckless disregard of Plaintiff's rights for which punitive damages are

appropriate and involved Defendants Wahl and McCormick, which is
Upper Management participation.

88.    As a result of the Defendants' unlawful conduct, Plaintiff suffered
economic damages including loss of income and benefits and also
suffered emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants awarding his
compensatory damages, inclusive of front and back pay, emotional distress
damages; punitive damages; reasonable attorney's fees and expenses pursuant to
N.J.S.A. § 34:15-39.1 and any other relief the Court deems proper and just.

## COUNT TWO

### (Termination in Violation of the New Jersey
### Law Against Discrimination, N.J.S.A. 10:5-1, et seq.)

89.    Plaintiff repeats and realleges each and every prior allegation as if set
forth at length herein.

90.    Defendants failed to engage in the interactive process after Plaintiff
sought an accommodation for his physical limitations.

91.    Additionally, Defendant articulated that Plaintiff had abandoned his
job as the reason for terminating Plaintiff's employment, which was pretextual
because Plaintiff was terminated in retaliation for his disability.

92.    In taking actions that they knew were a breach of Defendants' duty
under NJLAD, and knowingly giving substantial assistance or encouragement to the
unlawful conduct of their employer, Defendant Avalon, Defendant Wahl and/or
Defendant McCormick are individually liable under NJLAD.

93.    Defendants' conduct was egregious, willful and wanton and in reckless
disregard of Plaintiff's rights for which punitive damages are appropriate and
involved Defendants Wahl and McCormick, which is Upper Management
participation.

94.     As a result of the Defendants' unlawful conduct, Plaintiff suffered economic damages including loss of income and benefits and emotional distress. **WHEREFORE**, Plaintiff demands judgment against Defendants awarding her compensatory damages, inclusive of front and back pay, emotional distress damages; punitive damages; reasonable attorney's fees and expenses pursuant to N.J.S.A. § 10:5-27.1 and any other relief the Court deems proper and just.

## COUNT THREE

### (New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42 – Retaliation for her Disability)

95.     Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

96.     N.J.S.A. 10:5-12d prohibits an employer from retaliating against a person because he participated in a protected activity under the New Jersey Law Against Discrimination ("NJLAD").

97.     After Plaintiff advised defendants that he had sustained injuries this constituted a protected activity.

98.     Defendants' retaliatory actions as described in paragraphs 43 to 71, supra in this complaint were adverse employment actions in violation of the NJLAD.

99.     Thereafter, as a result of the protected activity, Defendants unlawfully retaliated against Plaintiff in violation of NJLAD.

100.    Additionally, Defendants failed to engage in the interactive process after Plaintiff sought an accommodation for his physical limitations.

101.    In taking actions that they knew were a breach of Defendant Avalon's duty under NJLAD, and knowingly giving substantial assistance or encouragement to the unlawful conduct of their employer, Defendant Wahl and Defendant McCormick's is individually liable under NJLAD.

102.    Defendants' conduct was egregious, willful and wanton and in reckless disregard of Plaintiff's rights for which punitive damages are appropriate and involved Defendant McMenamin's Upper Management participation.

103.   As a result of the Defendants' unlawful conduct, Plaintiff suffered economic damages including loss of income and benefits and also suffered emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants awarding her compensatory damages, inclusive of front and back pay, emotional distress damages; punitive damages; reasonable attorney's fees and expenses pursuant to N.J.S.A. § 10:5-27.1 and any other relief the Court deems proper and just.

## COUNT FOUR

### (Violation of NJLAD – Negligence in Failing to Remedy Hostile Work Environment)

104.  Plaintiff repeats and incorporates the preceding paragraphs as if set forth in their entirety.

105.  Defendants failed to engage in the interactive process after Plaintiff sought an accommodation for his physical limitations.

106.  Defendants were negligent in their efforts to remedy a hostile work environment in violation of NJLAD when they failed to adequately respond to Plaintiff's numerous complaints of incidents of hostility and disparate treatment.

107.  As a direct and proximate result of Defendants' negligent actions, Plaintiff has suffered loss of employment and the attendant wages and benefits, and medical and emotional distress damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment against the Defendants and requests the following relief:

        a.     Order that Defendants make Plaintiff whole for all losses Plaintiff has suffered, still suffers, and will suffer in terms of

lost wages, benefits, insurance and pension coverage, and any other fringe benefit of Plaintiff's employment;

b.    Award Plaintiff compensatory damages for injuries, including physical injuries and emotional distress, suffered as a result of Defendants' negligent failure remedy a hostile environment;

c.    Award punitive damages on account of the grounds of upper management's actual participation in and/or willful indifference to Defendant's discrimination and retaliation against Plaintiff;

d.    Award Plaintiff him reasonable costs and attorneys' fees and costs incurred in this litigation of this matter, including an enhancement of those fees as permitted under the law, and further including all time incurred in the effort to resolved the matter pre-litigation; and

e.    Grant Plaintiff such relief as the Court deems just and proper.

## COUNT FIVE

### (Retaliation in Violation of the NJLAD)

108.  Plaintiff repeats and incorporates the preceding paragraphs as if set forth in their entirety.

109.  In changing Plaintiff's job title and taking away administrative duties and employment status Defendant retaliated against Plaintiff for complaining to Defendants of discrimination with respect to his compensation and job duties.

110.  Defendant's retaliation against Plaintiff violates the provisions of the NJLAD.

111.  As a direct and proximate result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered, and will continue to suffer, the loss of his employment, the loss of significant wages and benefits, as well as substantial emotional distress damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment against the Defendants and requests the following relief:

a. Order that Defendants make Plaintiff whole for all losses Plaintiff has suffered, still suffers, and will suffer in terms of lost wages, benefits, insurance and pension coverage, and any other fringe benefit of Plaintiff's employment;

b. Award Plaintiff compensatory damages for injuries, including physical injuries and emotional distress, suffered as a result of Defendants' negligent failure remedy a sexually hostile environment and negligent failure to remedy handicap discrimination against Plaintiff in violation of the NJLAD;

c. Award punitive damages on account of the grounds of upper management's actual participation in and/or willful indifference to Defendant's discrimination and retaliation against Plaintiff;

d. Award Plaintiff his reasonable costs and attorneys' fees and costs incurred in this litigation of this matter, including an enhancement of those fees as permitted under the law, and further including all time incurred in the effort to resolved the matter pre-litigation; and

e. Grant Plaintiff such relief as the Court deems just and proper.

## COUNT SIX
### (U.S.C. § 1983)

112. Plaintiff repeats and incorporates the preceding paragraphs as if set forth in their entirety.

113. In terminating Plaintiff on or around January 18, 2021 due to his physical limitations, Defendant has discriminated against Plaintiff on account of disability and has deprived Plaintiff of equal protection under the laws and Constitution of the United States.

114. In bringing multiple charges against the Plaintiff in disciplinary actions Defendants deliberately acted to maximize the penalty it could impose on Plaintiff so as to demote him, penalize him financially, and otherwise interfere with his career. In so doing, Defendant has discriminated against Plaintiff on account of disability and for his protective activity of hiring an attorney and has deprived Plaintiff of equal protection under the laws and Constitution of the United States.

115. In refusing to reinstate Plaintiff to his position or another position, Defendants have, therefore, discriminated against Plaintiff on account of his disability and have deprived Plaintiff of equal protection under the laws and Constitution of the United States.

116. Upon information and belief, a review of other disciplinary proceedings, investigation, and prosecutions will show that it has sought to impose significantly more severe disciplinary sanctions against Plaintiff other than against employees without a disability.

117. Such discriminatory, illegal and unconstitutional actions have been taken with the full knowledge and approval of Defendants.

118. Defendants have acted to impose more severe discipline upon Plaintiff than warranted because of Plaintiff's disability and in retaliation for Plaintiff's speaking out about his rights as a disabled employee.

119. In engaging in the conduct set forth above, Defendants have deprived the Plaintiff of his rights, privileges and immunities secured under the laws and Constitution of the United States; has deprived Plaintiff of his right to be free from unlawful discrimination; and has deprived Plaintiff of his right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States and by 42 U.S.C. §§1983 and 1988.

## COUNT SEVEN

**Violation of Americans with Disabilities Act;
Failure to Accommodate under 42 U.S.C.A. §12112(b)(5)(A)**

120.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 119 above as if set forth in full herein.

121.   Defendants have discriminated against Plaintiff, a disabled person, on account of and/or by reason of his disability, nerve damage in violation of 42 U.S.C.A. §§12101 et seq., because during all relevant times:

(a) Plaintiff was disabled under the statute;

(b) Plaintiff was qualified to perform essential functions of one or more positions with or without an accommodation that became open prior to his discharge from employment by Defendants; and

(c) Plaintiff suffered adverse employment action because of his disability when Defendants failed to engage in a collaborative discussion with Plaintiff related to reasonable accommodations and subsequently terminated Plaintiff.

122.   Defendants discriminated against Plaintiff, among other ways, by developing, maintaining, and implementing a policy or practice referenced in the common allegations above, which served to discriminate against individuals with disabilities, including Plaintiff.

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.     Enjoin Defendants from failing or refusing to:

(a) Provide sufficient relief to make Plaintiff whole for the loss he has suffered as a result of the discrimination against him in this Complaint;

(b) Adopt a clear, meaningful, and well-publicized written policy prohibiting disability discrimination against any of Defendants employees, which includes provisions describing the responsibilities of all supervisors to report and respond to complaints of disability discrimination and which establishes an effective mechanism for receiving and responding to complaints of disability discrimination;

(c) Modify its existing disability discrimination policy to include clear, meaningful, and well-publicized provisions describing the responsibilities of all supervisors to report and respond to complaints of disability discrimination and establish an effective mechanism for receiving and responding to complaints of disability discrimination; and

(d) provide adequate training to all of Defendant's employees and to all of Defendant's management officials responsible for making a determination regarding complaints of disability discrimination regarding workplace disability discrimination prohibited by the ADA.

(e) Take other appropriate nondiscriminatory measures to

overcome the effects of the discrimination.

2.     Award compensatory damages to Plaintiff for mental and/or physical injuries incurred as a result of the discrimination against him as alleged in this Complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1992, 42 U.S.C.A. §1981a and/or the ADA.

## COUNT EIGHT

### Violation of Americans with Disabilities Act; Disparate Treatment

123.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 122 above as if set forth in full herein.

124.  Defendants have discriminated against Plaintiff, a disabled person, on account of and/or by reason of his disability, nerve damage in violation of 42 U.S.C.A. §§12101 et seq., because during all relevant times:

(a) Plaintiff was disabled under the statute;

(b) Plaintiff was qualified to perform the essential functions of one or more positions with or without an accommodation that become open prior to his discharge from employment by Defendants; and

(c) Plaintiff suffered an adverse employment action because of his disability when Defendants treated nondisabled individuals more preferentially as it pertains to its policy or practice as alleged in the common allegations above, which served to discriminate against individuals with disabilities, including Plaintiff.

22

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.  Enjoin Defendant from failing or refusing to:

(a) Provide sufficient remedial relief to make Plaintiff whole for the loss he has suffered as a result of the discrimination against him as alleged in this Complaint;

(b) Modify its existing disability discrimination policy to include clear, meaningful, and well-publicized provisions describing responsibilities of all supervisors to report and respond to complaints of disability discrimination, and to establish an effective mechanism for receiving and responding to complaints of disability discrimination; and

(c) Take other appropriate nondiscriminatory measures to overcome the effects of the discrimination.

2. Award compensatory damages to Plaintiff for mental and/or physical injuries incurred as a result of the discrimination against him as alleged in this Complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C.A. §1981a and/or the ADA

3. Award Plaintiff for such additional relief as justice may require, together with attorney's fees, costs, and disbursements.

### COUNT NINE

(Violation of the Family Medical Leave Act)

125.   Plaintiff repeats and incorporates the preceding paragraphs as if set forth in their entirety.

126.   The FMLA entitles eligible employees to a "total of 12 workweeks of leave during any 12-month period" if the employee needs the leave for any one of several reasons including: to care for a family member suffering from a serious health condition or Grieve the loss of a family member.

127.   Plaintiff's grandmother's died for which Plaintiff requested to take his intermittent family leave which is recognized within the meaning of the FMLA.

128.   The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1), or "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

129.   By denying Plaintiff of his right to take intermittent leave to grieve his dead grandmother, Defendant violated the provisions of the FMLA.

130.   As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff has suffered damages.

## COUNT TEN

**Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act; Obstruction of Justice and Witness Tampering under 18 U.S.C.A. §§1512(b), (c), (d), 1962, and 1964**

131.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 130 above as if set forth in full herein.

132.   At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C.A. §§1961(3) and 1962.

133.   At all relevant times, each Defendant is a person within the meaning of 18 U.S.C.A. §§ 1961(c) and 1962.

134. At all relevant times, each of the Rico Defendants was, and is, a person that exists separate and distinct from the Rico enterprise, described below.

## A. The RICO Enterprise

135. Defendants Scott Wahl and William McCormick in their individual capacities for the Borough of Avalon, Charles Schlager, Jr. Esq. and John Doe(s) 1-10 constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§1961(4) and 1962, referred to herein as the "Enterprise."

136. Defendants Scott Wahl and William McCormick in their individual capacities for the Borough of Avalon, Charles Schlager, Jr. Esq. and John Doe(s) 1-10 are a group of persons associated together in fact, for the common purpose of carrying on an ongoing criminal enterprise of witness tampering and mail fraud. In particular, the Enterprise has a common goal of hindering Plaintiff's Constitutional right to earn income (preventing promotions and wrongful termination) and damaging his reputation through a sophisticated, coordinated, sustained, well-orchestrated and multi-year campaign of deceptive conduct, illegal coercion of false testimony, and misrepresentations made to the Cape May County Administrative Courts in hearing regarding disciplinary actions against employees. They intended to further that objective, and exercised substantial discretion in doing so.

137.   The Enterprise is ongoing because members of the Enterprise have long-standing business relationships rooted in the municipality, common control, ongoing business arrangements, and a mutual interest in common (criminal) activities. For instance, beginning in 2019:

(i) members of the Enterprise discouraged the promotion of highly-qualified employees;

(ii) that same year, members of the Enterprise intimidated and coerced witnesses into giving false testimony at administrative proceedings;

(iii) in 2020, employees manufactured complaints against Plaintiff in a scheme to seize his rightfully owned firearms;

(iv) that same year, employees of the Enterprise manufactured complaints against Plaintiff stating he "stole borough records," which he had lawful access to;

(v) that same year, employees of the Enterprise forced Plaintiff to work injured; and

(vi) to date, the Enterprise continues to manufacture false testimony and coerce witnesses into giving false testimony against employees in administrative disciplinary proceedings.

138.   To the extent that the Enterprise gained economic advantage or intended to gain economic advantage from its criminal activity, each member of the Enterprise gained or intended to gain economic advantage from the same activity.

139.   The Enterprise has longevity sufficient to permit Defendants to

pursue the Enterprise's goal of hindering Plaintiff's Constitutional right to earn income and damage his reputation. The scheme at the heart of the Enterprise has been in operation since at least May 2012, and potentially as far back as April 2011. This scheme is ongoing and will continue until the members of the Enterprise achieve their goal of hindering Plaintiff's Constitutional right to earn income and damage his reputation, thereby furthering their economic gain and political influence in the municipality through nepotistic practices such as the promoting substandard family member employees such as William McCormick, Jr. Among other things, the members of the Enterprise

140. The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure, operating in, and directed from, the United States. While the organization of the Enterprise may have changed over time, and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of their criminal scheme, including as follows:

(a) Defendants Scott Wahl and William McCormick in their individual capacities for the Borough of Avalon, Charles Schlager, Jr. Esq. and Defendants John Doe(s) 1-10 have been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to hinder Plaintiff's Constitutional right to earn income and damage his reputation, and has taken actions and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise,

27

including manufacturing workplace complaints against Plaintiff and intimidating witnesses to administrative disciplinary proceedings. From and through their business relationships, they have conducted and participated in the operation and management of the Enterprise and its affairs, and have been a central participant in the orchestration, planning, and execution of the scheme to hinder Plaintiff's Constitutional right to earn income and damage his reputation. Moreover, on information and belief, Defendants Scott Wahl and William McCormick in their individual capacities for the Borough of Avalon, Charles Schlager, Jr. Esq. and Defendants John Doe(s) 1-10 enjoyed personal financial benefits as a result of this scheme through payments from Borough of Avalon.

(b) Directly and through its agent officers, directors, board members, and employees, Borough of Avalon has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to hinder Plaintiff's Constitutional right to earn and injure his reputation. Borough of Avalon has been responsible for entering into the agreements and contracts with their employees that directly facilitated the criminal activities of the Enterprise, such as witness tampering. Its high-level principals and employees, including Defendants Scott Wahl, William McCormick, Sr. and Charles E. Schlager, Jr., Esq. knowingly and directly engaged in the criminal activities of the Enterprise such as witness tampering and mail fraud, within the scope of their employment as Borough

of Avalon agents. Thus, Borough of Avalon has, with the other RICO Defendants, been responsible for conducting a covert campaign to force Plaintiff out of his job, by, among other things, coercing witnesses such as Stephan Camp to administrative proceedings into giving false testimony, manufacturing false reports to the police to seize Plaintiff's lawfully owned firearms, and deceiving the administrative judges about the activities of the RICO Defendants, their relatedness to and coordination between one another, and the true nature of their fraudulent business practices. Borough of Avalon stood to benefit from this scheme because in the event of Plaintiff's discharge of employment, they could gain economic and political advantages through nepotistic hiring practices.

141.   Each of the RICO Defendants knew of the existence of and conducted or participated in the operation or management of, the Enterprise and its affairs.

142.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C.A. §1962. The Enterprise regularly participated in the multi-million-dollar enterprise of public government, and used public funds to carry out these practices and cover up their wrongdoing.

### B. Pattern of Racketeering Activity

143.   The RICO Defendants conducted or participated, directly or indirectly, in their conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) and in violation of 18 U.S.C. §1962. This pattern included multiple predicate acts,

including obstruction of justice through corruptly endeavoring to influence, obstruct, or impede the due administration of justice in a pending judicial proceeding in violation of 18 U.S.C. §1503. These predicate acts are all related to each other and to the Enterprise's purpose of hindering Plaintiff's Constitutional right to earn income and damage his reputation.

144.   Furthermore, Defendants' pattern of racketeering activity is continuous. The numerous predicate acts detailed below over a substantial period of time, from November 2019 to the present. Thus, Defendants' scheme will continue in the future until they achieve their objective, and Defendants will continue to make false statements to courts and to engage in other acts of obstruction and fraud in order to bring this scheme to fruition.

## 1. Pattern of Racketeering Activity: Obstruction of Justice in Violation of 18 U.S.C. §1503

145.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 144 above as if set forth in full herein.

146.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. §1961(a) is "any act which is indictable under [18 U.S.C.] section 1503 (relating to obstruction of justice)." Title 18 U.S.C.A. §1503 prohibits individuals from, among other things, "corruptly ... endeavor[ing] to influence obstruct, or impede the due administration of justice ..."

147.   As described herein, Borough of Avalon and John Doe(s) engaged in a scheme whose purpose was to hinder Plaintiff's Constitutional right to earn income and damage his reputation. In an effort to conceal their scheme,

Defendants knowingly filed false statements with the Administrative Court and made false statements under oath. In doing so, Borough of Avalon and John Doe(s) 1-10 endeavored to act corruptly with an intent to obstruct or interfere with an administrative proceeding, thereby interfering with "the due administration of justice" in violation of 18 U.S.C.A. §1503.

148.   While Plaintiffs contend that the extent of Defendants' misrepresentations and false declarations will be revealed by discovery in this action, Defendants' corrupt activities include at least the following instances:

(i) Defendants through their agent/in house counsel, Charles E. Schlager, Jr., Esq., tamper with testimony to prevent Plaintiff from obtaining unemployment benefits.

(ii.) Defendants Defendants through their agent/in house counsel, tamper with the testimony of Stephen Camp prior to the November 2019 disciplinary hearing conducted against Plaintiff to cause Plaintiff to lose his supervisory position and be demoted to a position that Plaintiff was not physically able to perform.

(iii.) Defendants through their agents did cause such false testimony and evidence to be sent through the Unites States Postal Services.

149.   The motive for Defendants' omissions and misstatements is obvious: to gain economic and political advantages. After years of nepotistic hiring practices and favoritism, Plaintiff a high-qualified, highly-skilled, and experienced employee rose through the ranks quicker than most previous employees angering those who attempted to maintain the corrupt status-quo along the way. To

prevent this result—and preserve their scheme—Defendants spoliated evidence and intimidated witnesses to administrative proceedings that would have put their scheme in jeopardy. These actions evidence a corrupt intent to attack the integrity of the administrative court proceeding and obstruct the due administration of justice.

150.   Defendants campaign to whitewash their record of coordination continued as litigation commenced between Plaintiff and local police. Where they made a concerted effort to deem Plaintiff mentally unfit to possess his lawfully owned firearms.

151.   Accordingly, Defendants have unlawfully obstructed and impeded the due administration of justice in violation of 18 U.S.C.A. §1503.

## C. Injury and Causation

152.   Plaintiff has been and will continue to be injured in his business and property by reason of Defendants' violations of 18 U.S.C.A. §1962, in an amount to be determined at trial. The injuries to Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. §1962 include, but are not limited to, unpaid wages due to wrongfully withheld compensation; wrongful termination; lost opportunities; damage to reputation and goodwill; and attorney's fees and costs, including the attorney's fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

153.   Pursuant to 18 U.S.C.A. §1964(c), Plaintiff is entitled to recover treble damages, plus attorney's fees and costs, from Defendants. Further, Plaintiff is entitled to appropriate injunctive relief to prevent and restrain the ongoing

racketeering activities.

## COUNT TEN

### Conspiracy to Violate RICO, 18 U.S.C. §1962(d)

154.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 153 above as if set forth in full herein.

155.  Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962 as described above, in violation of 18 U.S.C. §1962(d).

156.  By and through each Defendant's close coordination with one another, including while engaging in the intimidating witnesses to administrative proceedings, and before, during, and after fraudulently commencing their unjust prosecution of Plaintiff—which lead to his wrongful termination—each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

157.  Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. 1962. In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each Defendant shared a common purpose, namely, the orchestration,

planning, perpetration, and execution of a scheme to hinder Plaintiff's Constitutional right to earn income and damage his reputation through claims based on knowingly false accusations, as evidence by, among other things, intimidation of Defendant employees such as Stephen Camp to testify falsely against Plaintiff in his disciplinary hearing and when Defendant's agent Charles E. Schlager, Jr., Esq., circulated manufactured scripts in lieu of truthful testimony at Plaintiff's unemployment hearing.   In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among Defendants is particularly within their control.

158.  The participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity.

159.  Plaintiff has been and will continue to be injured in his business and property by reason of Defendants' violation of 18 U.S.C. §1962(d), in an amount to be determined at trial. The injuries to Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. §1962(d) include, but are not limited to, unpaid wages due to wrongfully withheld compensation; wrongful termination; lost opportunities; damage to reputation and goodwill; and attorney's fees and costs, including the attorney's fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

160.  Pursuant to 18 U.S.C. §1964(c), Plaintiff is entitled to recover treble damages, plus attorney's fees and costs, from Defendants. Further, Plaintiff is entitled to appropriate injunctive relief to prevent and restrain the ongoing racketeering activities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

1. General and compensatory damages according to proof at trial;

2. Treble damages pursuant to 18 U.S.C. §1964(c);

3. Punitive damages;

4. Appropriate equitable relief, including but not limited to an order preventing and restraining the ongoing racketeering activities

5. Declarations that Defendants violated the Americans with Disabilities Act through a failure to accommodate under 42 U.S.C.A. §12112(b)(5)(A) and through disparate treatment.

6. Declarations that Defendants violated 18 U.S.C. §1962(c) and 18 U.S.C. §1962(d)

7. A declaration that Defendants committed fraud against Plaintiff

8. An award of reasonable attorney's fees and costs pursuant to 18 U.S.C. §1964(c)

9. Pre-judgment interest; and

10. Such other and further relief as this Court may deem just and proper.

> **McIlwain Law Firm**
> Attorneys for Plaintiff,
> William Deeney
>
> By: _*Timothy J. McIlwain*__
> Timothy J. McIlwain, Esq
> 2020 New Road, Suite A
> Linwood, NJ 08221
> Ph: (877) 375-9599
> Fax: 609-450-7017
> Email: AttorneyMcilwain@me.com

Dated:   September 14, 2022

## DEMAND FOR TRIAL BY JURY

Under Rule 39(b) of the Federal Rules of Civil Procedure, Plaintiff William Deeney hereby demands a trial by a jury as to all issues.

**McIlwain Law Firm**
Attorneys for Plaintiff,
William Deeney


By: *Timothy J. McIlwain*
Timothy J. McIlwain, Esq



Dated:   September 14, 2022